Filed 6/15/16  Pinto v. Pantaleoni CA1/1
Received for posting 6/16/16

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SHEREEN PINTO et al.,<br><br>　　　Plaintiffs and Appellants,<br><br>v.<br><br>ANTHONY PANTALEONI et al.,<br><br>　　　Defendants and Respondents. | A143214<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-11-516428)<br><br>ORDER MODIFYING OPINION AND<br>DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

BY THE COURT:

It is ordered that the opinion filed May 16, 2016, be modified as follows:

1. On page 3, the following new footnote 2 should be added at the end of the sentence beginning "Unlike with the podium," and ending "despite proper design" in the third paragraph on the page (all subsequent footnotes should be renumbered):

    **2**  There are other Aquatech reports in the record.  One bears the subject notation "Site Testing and DT May 24th, 2011" and was stored in a computer file "Z:\Common\ . . . \Attachments to 0817.2011 email

1

toGoyette\2716sitesum052411cas.doc testing.doc." This report describes the various tests conducted at the building and states in pertinent part:

> "Original building plans were made available . . . . An initial review indicates a flat structural substrate to be waterproofed with Grace Bituthene, covered with a sloped topping slab 1/4"/ ft. per page A-4.2 (and others). Plan page A-8.1, details 5 and 10 indicate a sloped topping slab, perhaps with a sloped structural slab, but there are no such notes and these details can easily be regarded as a level structural slab."

> In their petition for rehearing, plaintiffs contend this report (1) undermines the August 12 report as suggesting a design defect and (2) is dated August 17, making it the later more reliable report. To begin with, regardless of the date of this report, it supports, rather than undermines a design defect as it indicates an "initial review" of the plans showed they called for an improper "flat structural substrate." That other portions of the plans may have been *unclear* about the flatness or slope of the substrate does not negate the other observations. As for the date of this report, the architects cited to it in their summary judgment reply papers as a May 24, 2011, report. This is also consistent with the report's subject line and file name, and at no time in the trial court or in this court, until the rehearing petition, did plaintiffs take issue with the May 24 date. Additionally, a third report, bearing dates of May 24 and May 26, has the *identical* language. The August 17 date merely reflects the date it was sent to the mediator, Goyette, as indicated by the document's filename, "0817.2011 email to Goyette\ 2716sitesum052411cas.doc testing.doc." In any case, the August 12 report which we have quoted above, clearly states it is summarizing the other reports, and given the contents of these reports and the overall context, it is indisputable that the report plaintiffs are now pointing to did not divulge anything new or different after the August 12 report we have discussed above.

2. On page 11, newly renumbered footnote 7 (originally filed as fn. 6) shall be modified to read as follows (all subsequent footnotes should be renumbered accordingly):

> **7** Contrary to plaintiffs' assertion, the "mediation privilege" codified in Evidence Code section 1119 does not bar use of the settlement demand letter. This is so even when we amplify the mediation privilege through Civil Code section 6000, subdivision (*l*), a provision plaintiffs did not cite until their petition for rehearing. That section provides: "All defect lists and demands, communications, negotiations, and settlement offers made in the course of the

2

prelitigation dispute resolution process provided by this section shall be inadmissible pursuant to Sections 1119 to 1124, inclusive, of the Evidence Code and all applicable decisional law."

The problem for plaintiffs is they never raised the privilege at any time in the trial court, and so cannot assert it for the first time on appeal or rehearing, and thereby change the factual complexion of the case.

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless [¶] . . . [t]here appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion." (Evid. Code, § 353; *Duronslet v. Kamps* (2012) 203 Cal.App.4th 717, 726 [failure to object "deprives the proponent of the evidence an opportunity to establish a better record or some alternative basis for admission"].)  This rule applies to evidence admitted where a privilege might have been asserted.  (*People v. Collie* (1981) 30 Cal.3d 43, 49; *Conservatorship of Bones* (1987) 189 Cal.App.3d 1010, 1018; *People v. Henderson* (1981) 117 Cal.App.3d 740, 745; see also Code Civ. Proc., § 437c, subd. (b)(5) ["Evidentiary objections not made at the hearing shall be deemed waived."]; *Foxgate Homeowners' Assn. v. Bramalea California, Inc.* (2001) 26 Cal.4th 1, 10, fn. 7 ["Failure to object to admission of evidence of events occurring during a prior mediation has been held to constitute a waiver."].)

In their petition for rehearing, plaintiffs contend *Simmons v. Ghaderi* (2008) 44 Cal.4th 570 (*Simmons*) does not allow implied waiver of the mediation privilege by litigation conduct.  *Simmons*, however, addresses a very different sort of waiver—it rejects the concept of global waiver of the privilege when a litigant fails to assert it in response to one disclosure (for instance, when privileged material is attached to a pretrial motion) but later asserts it in another context (for example, where that same material is introduced at trial).  (*Id.* at p. 577.)  *Simmons* does not address the situation where, as here, a litigant fails to object in a particular context (or at any time) in the trial court and then seeks to invoke the privilege *in that same context* for the first time on appeal.  Thus, *Simmons* makes no reference to Evidence Code section 353, nor does it remotely suggest that the well-established requirement that objections to evidence must be preserved for review uniquely does not apply to the mediation privilege.

3. On page 15, new footnote 8 should be inserted at the end of the first sentence in the first paragraph.  The sentence ends with the words "of their ignorance," and the footnote should be placed following the word "ignorance."  It should read as follows:

3

[8] We note that in the trial court, the architects introduced the Aquatech reports with their summary judgment moving papers and referenced them in their statement of proposed undisputed facts.  Plaintiffs responded, as discussed above, raising the defense of the Doe statute.  The architects in their reply papers quoted from the reports extensively, arguing the Doe statute was inapplicable.  At the summary judgment hearing, plaintiffs had ample opportunity to respond to the points made in the reply and to address the Aquatech reports further, but did not do so.

There is no change in the judgment.

The petition for rehearing is denied.

Dated:

_____

Humes, P. J.

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| SHEREEN PINTO et al.,<br><br>       Plaintiffs and Appellants,<br><br>v.<br><br>ANTHONY PANTALEONI et al.,<br><br>       Defendants and Respondents. | A143214<br><br>(San Francisco City & County<br>Super. Ct. No. CGC-11-516428) |

Plaintiffs, who had interests in a mixed-use development at 15th and Market in San Francisco, sued various contractors for construction defects.  They also sued fictitious Doe defendants for design defects.  Later, after the statute of repose had run on any new defect claims, plaintiffs amended their complaint to substitute the project's architects for Does 1, 2, and 3.  The architects moved for and were granted summary judgment based on the statute of repose.

Plaintiffs assert, as they did below, that California's Doe pleading statute allows them to avoid the statute of repose because their substitution of the architects "relates back" to the timely filing of their initial complaint.  For plaintiffs to prevail on this argument, they must show there is a triable issue of material fact that they were truly and in good faith "ignorant" of any basis for the architects' alleged liability.  Like the trial court, we conclude they failed to make this showing, and therefore affirm the judgment.

1

Jeremy Kotas and Anthony Pantaleoni own Kotas/Pantaleoni Architects, the principal architect for a four-story mixed use building located at 15th and Market Street in San Francisco, California. The Caridad Gravitt Trust, through its successor trustee William Gravitt, was the project developer. A certificate of final completion and occupancy for the building issued on March 21, 2002.

The first two floors of the building are commercial space and serve as a "podium" atop which sit nine residential units. The residential units surround an outdoor courtyard called the podium deck. A Joint Maintenance Committee cares for common areas, including the podium, and a homeowners association (HOA) governs the residential portions of the building.

About nine years after building completion, in early 2011, Gravitt, the developer, learned of a leak in one of the commercial units and suspected water intrusion from the podium above. He hired Aquatech Consultancy to investigate.

Meanwhile, the HOA hired a lawyer, Ann Rankin, to investigate a leak emanating from a landing between two of the residential units which had damaged the unit owned by Shereen Pinto. Rankin served upon developer Gravitt a "Calderon notice" of the HOA's claims pursuant to the then-effective version of Civil Code section 1375.[1] The notice referenced both the landing leak and the podium leak.

Gravitt's attorney, Mark Humbert, forwarded the Calderon notice to the architects on August 18, 2011. He did so believing the architects were "design professionals" who bore "potential responsibility," and thus were entitled to notice from the developer under

---

[1] That statute, which has since been repealed and recodified, set forth pre-litigation requirements when "a complaint for damages against a builder, developer, or general contractor . . . of a common interest development" is contemplated because of "defects in the design or construction of the common interest development." (Former Civ. Code, § 1375, repealed by Stats.2012, ch. 180 (A.B.805), § 1; see Civ. Code, § 6000.)

former Civil Code section 1375, subdivision (e)(2). Humbert's letter stated it was enclosing "reports from Aquatech . . . and estimates by Draeger Construction to repair problems caused by the design and construction of the property."

The Aquatech reports Humbert included were all signed by Charles Saul. The report dated August 12, 2011, summarized Aquatech's findings to date.

As to the podium leak, it found:

"1. The building plans indicate a flat structural slab (substrate) to be covered with a waterproof membrane, covered with a sloped topping (walking) slab. [¶] 2. The substrate was constructed flat. [¶] 3. The waterproof membrane used must be adhered to a sloped substrate. [¶] 4. The waterproof membrane was installed contrary to manufacturer's installation instructions."

These findings suggested a design flaw, as the building *plans* indicated for a flat substrate, despite the need for a sloped one given the Bituthene membrane the plans specified. The recommended fix was to, among other things, install a different kind of membrane that would be compatible with a flat substrate.

As to the landing leak, the report found:

"1. The building plans indicate a sloped wood substrate. [¶] 2. The substrate was constructed flat. [¶] 3. The waterproof membrane used must be adhered to a sloped substrate. [¶] 4. The waterproof membrane was installed contrary to manufacturer's installation instructions."

Unlike with the podium, there was no suggestion of deficient design, but rather a suggestion the landing was deficiently *built* despite proper design.

Humbert's August letter also informed the architects about an upcoming mediation, telling them he had included "an email from mediator Ann Goyette, setting a mediation in this matter for Wednesday, September 21, 2011. We request that you place your insurer(s) on notice of this mediation, and we request your and their presence at the mediation."

Humbert now disclaims having had any pre-litigation knowledge of facts suggesting potential liability on the part of the architects. In his declaration filed in

3

opposition to the motion for summary judgment, Humbert avers that, in September 2011 (a month after he forwarded the Calderon notice and Aquatech reports), he "communicated with Charles Saul of Aquatech—who had been investigating the Podium and preparing the reports noted above—regarding [the architects'] potential liability." His declaration continues: "Although Mr. [Saul] is not an architect, Aquatech specializes in water infiltration investigations. As a result of this communication, I did not believe I had a basis to pursue a claim against" the architects. There is no declaration from Saul.

In mid-September 2011, the mediation got rescheduled, with plans for a preparatory teleconference on September 21 and mediation on October 5.

Also in mid-September, the HOA's lawyer, Rankin, sent settlement demand letters to both Gravitt and the architects. Each demand sought compensation for $116,136 in damages incurred by the HOA and Pinto in responding to the landing leak. The letter to the architects closed by stating:

> "Unless this claim can be resolved informally or by mediation by October 5, 2011, the Association and Ms. Pinto intend to file suit against your client and against the developer and general contractor. Please put your client's professional liability insurer on notice of this claim and inform the claims representatives of the deadline. Thank you for your anticipated courtesies."

The architects did not attend the mediation and no resolution with them was reached.

At the end of October, Rankin sent a letter to the various parties, including the architects " 'seeking cooperation in our ongoing efforts to resolve the legal proceedings arising from the work performed at 2189 Market Street without resort to filing a lawsuit.' " The letter sought an extension of time to file suit under tolling provisions of former Civil Code section 1375. It threatened a failure to consent would result in litigation. The architects did not grant an extension.

In November 2011, Scott Williams, the attorney who had been representing the Joint Maintenance Committee, which oversees podium maintenance, took over

4

representation of all the soon-to-be plaintiffs—the HOA (formerly represented by Rankin), Pinto, Gravitt (formerly represented by Humbert), the trust, and the Joint Maintenance Committee.

Plaintiffs filed suit the following month, on December 8, 2011, against the general contractor and several subcontractors asserting defects related to the landing and damage to Pinto's unit, and to the podium and damage to the commercial area.

In their initial complaint, plaintiffs also named fictitious "Doe" defendants, alleging: "Plaintiffs are ignorant of the true names and capacities of defendants sued herein as Does 1 through 3000, and plaintiffs are further ignorant of the appropriate charging allegations and theories of liability with respect to said fictitiously named defendants, and plaintiffs therefore sue such defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained. Based on information and belief, each of the defendants so designated herein is legally responsible and liable in same manner for the events and happenings referred to herein, and is therefore liable and responsible to plaintiffs for amounts to be hereinafter determined."

In particular, "Defendants Does 1 through 200," alleged plaintiffs, "designed, engineered, surveyed, provided plans and specifications for, supervised and provided other services related to the design and supervision of construction of the Property." Thus, Does 1 through 200 were alleged to have engaged in negligent design and breach of warranty.

In his declaration in opposition to the motion for summary judgment, Williams averred that he did not, before filing the initial complaint, "consult with an architect or design professional regarding the liability of Kotas or any of the other design professionals on the project." Nor did he "review any of the project documents, the plans or specifications, or any of the contracts with the designers and contractors on the project, including Kotas' contract." Further, he "did not receive any information from Aquatech,

5

MCA or any other source indicating that Kotas was liable for the deficiencies in the Podium, the Landings, or any other defects or damages at the property."

Three months after plaintiffs filed their complaint an important date passed— March 21, 2012—marking 10 years from the issuance of the certificate of final completion and occupancy for the project. As will be discussed, Code of Civil Procedure section 337.15[2] requires that claims based on the design or construction of real property be brought within 10 years of substantial completion of the property's development.

Williams claims to have "first learned" of the architects' potential liability about a year after that, in March 2013, when one of plaintiffs' experts discovered it while preparing for his deposition. The entirety of the explanation for this belated discovery, as stated in Williams' declaration in opposition to the motion for summary judgment, is as follows: "In the course of preparing for his deposition, Omar Hindiyeh of CMA Consulting, one of plaintiffs' experts, became aware of [the architects'] liability and so informed me." Plaintiffs provided no information about what documents and materials their expert reviewed, why the expert now suspected liability, or even the theory of such liability.

In any event, on April 9, 2013, plaintiffs filed an amendment to their complaint, substituting the architects for Does 1–3. They also filed a certificate of merit under section 411.35, which stated a third-party architect had reviewed the work of Kotas, Pantaleoni, and their firm, and opined they had been negligent in their design services.

The architects answered the amended complaint in June and raised the 10-year statute of repose in Code of Civil Procedure section 337.15 as an affirmative defense.

Plaintiffs filed a second amended complaint in early 2014. In addition to negligence and breach of warranty, the new pleading asserted a breach of contract cause

---

[2] All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

6

of action against the architectural firm. Again, the architects answered, asserting section 337.15 as a bar.

The architects eventually moved for and were granted summary judgment on the basis of the statute of repose.

DISCUSSION

" 'A defendant moving for summary judgment based upon an affirmative defense, as here, bears an overall burden of persuasion that there is a complete defense to the plaintiff's action. . . .' [Citation.] In other words, the defendant must persuade the court there is no triable issue of fact as to that defense. [Citation.] In meeting the burden of persuasion, the defendant 'bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact' as to the defense. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 . . . .) 'Once the defendant has met that initial burden of production, the burden shifts to the plaintiff to present evidence showing the existence of a triable issue of one or more material facts as to that defense.' [Citation.] A triable issue of material fact exists if ' "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof" at trial.' " (*Fazio v. Fairbanks Ranch Country Club* (2015) 233 Cal.App.4th 1053, 1057 (*Fazio*).)

Our review of an order granting summary judgment is de novo. (*Fazio, supra*, 233 Cal.App.4th at p. 1058.) "We exercise our independent judgment as to the legal effect of the undisputed facts [citation] and must affirm on any ground supported by the record." (*Jimenez v. County of Los Angeles* (2005) 130 Cal.App.4th 133, 140.) We view the evidence in the light most favorable to the nonmoving, losing party. (*Fazio*, at pp. 1057–1508.) Nevertheless, an opposing party must still come forward with "admissible evidence . . . , not merely claims or theories" or mere "conclusionary" statements or "conjecture and speculation." (*Wiz Technology, Inc. v. Coopers & Lybrand* (2003) 106 Cal.App.4th 1, 10–11.)

7

***Prima Facie Showing That Claims Are Time Barred***

The architects plainly made out a prima facie case that plaintiffs' claims against them are barred by section 337.15. They were not named as defendants until well over 10 years after completion of the project at 15th and Market, even taking into account extensions of that period under the Calderon notice process. Thus, the pivotal issue is whether plaintiffs can avoid the 10-year statute through the "relation back" doctrine.

The use of fictitious Doe defendants in California arises from statute. When a plaintiff "is ignorant of the name of a defendant" and plaintiffs "state that fact in the complaint . . . such defendant may be designated in any pleading or proceeding by any name, and when his true name is discovered, the pleading or proceeding must be amended accordingly." (§ 474.)

An amendment substituting a named defendant for a Doe defendant can relate back to a timely initial pleading and thereby "defeat[] the bar of [a] statute of limitations," so long as the requirements of section 474 are met. (*Marasco v. Wadsworth* (1978) 21 Cal.3d 82, 85; *McOwen v. Grossman* (2007) 153 Cal.App.4th 937, 943 (*McOwen*) [with a timely complaint, the issue becomes relation back]; *Fuller v. Tucker* (2000) 84 Cal.App.4th 1163, 1169–1170 (*Fuller*); *Woo v. Superior Court* (1999) 75 Cal.App.4th 169, 176 (*Woo*) ["If the requirements of section 474 are satisfied, the amended complaint substituting a new defendant for a fictitious Doe defendant filed after the statute of limitations has expired is deemed filed as of the date the original complaint was filed."].) Thus, section 474 can be characterized as an exception to a statute of limitations defense. (*Woo*, *supra,* 75 Cal.App.4th at p. 176 [section 474 a "recognized exception" to rule that amendments adding new defendants do not relate back to earlier complaints].)[3]

---

[3] Section 474 is said to give a plaintiff up to three extra years to name defendants. (*Bernson v. Browning-Ferris Industries* (1994) 7 Cal.4th 926, 932.) This is due to the interaction of section 474 and section 583.210, which requires service of a complaint on a

8

Here, as in most relation back cases, the crucial question is the state of plaintiffs' knowledge or their ability to know the relevant facts—that is, were they truly ignorant of any basis for the architects' alleged liability before filing their amendment substituting them for Does. (See *McOwen*, *supra*, 153 Cal.App.4th at p. 942.) " 'In keeping with th[e] liberal interpretation of section 474, it is now well established that even though the plaintiff knows of the existence of the defendant sued by a fictitious name, and even though the plaintiff knows the defendant's actual identity (that is, his name), the plaintiff is "ignorant" within the meaning of the statute if he lacks knowledge of that person's connection with the case or with his injuries.' " (*Ibid.*; see also *Fuller, supra*, 84 Cal.App.4th at p. 1170.)

At this juncture in the analysis, we make two assumptions to simplify the discussion. First, we assume, without deciding, that the proper naming of Doe defendants under section 474 defeats not only the bar of a statute of limitations, but also a statute of repose such as the 10-year statute of repose set forth in section 337.15 at issue here.[4] Second, we assume, without deciding, that the architects bore the initial burden of producing evidence showing plaintiffs were not "ignorant" of the architects' potential liability, even though section 474 appears to be an exception to, and not an element of,

---

defendant within three years of its filing. (*Bernson, supra*, at p. 932; *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 398.) So ultimately, a timely Doe action " 'effectively enlarg[es] the . . . limitations period for three years.' " (*Norgart*, *supra*, at p. 398.)

[4] While "a statute of limitations creates 'a time limit for suing in a civil case, based on the date when the claim accrued' . . . [¶] [a] statute of repose . . . puts an outer limit on the right to bring a civil action. That limit is measured not from the date on which the claim accrues but instead from the date of the last culpable act or omission of the defendant. A statute of repose 'bar[s] any suit that is brought after a specified time since the defendant acted (such as by designing or manufacturing a product), even if this period ends before the plaintiff has suffered a resulting injury.' " (*CTS Corp. v. Waldburger* (2014) __ U.S. __ [134 S.Ct. 2175, 2182–2183].)

9

the 10-year time bar.[5] We, thus, turn to the question of ignorance and the parties' evidentiary showings.

To claim ignorance and take advantage of the relation back doctrine, a plaintiff need not first attempt to investigate to determine the identity or liability of a potential defendant. (*Fuller*, *supra*, 84 Cal.App.4th at p. 1172.) The test is the plaintiff's knowledge at the time of filing, not the plaintiff's reasonable diligence, and Doe pleading can be used whether a plaintiff's ignorance derives from misfortune or negligence. (*Id.* at p. 1170.)

Nevertheless, over a century ago, our Supreme Court has indicated the Doe pleading statute should not reward the plaintiff who overlooks " 'readily accessible' " means of identifying a defendant. (*Bernson v. Browning-Ferris Industries* (1994) 7 Cal.4th 926, 942 (dsn. opn. of Kennard, J.), quoting *Irving v. Carpentier* (1886) 70 Cal. 23, 26.) A plaintiff may not have a duty to unearth new information, but a plaintiff does bear a responsibility for reviewing "readily available information" in his or her possession. (*Woo*, *supra*, 75 Cal.App.4th at p. 180.) "A requirement of reviewing readily available information is not a significant burden, is not inconsistent with the cases that impose no duty of inquiry on plaintiffs who never knew the defendant's identity, and assures the good faith of plaintiffs who seek to use the section 474 relation-back doctrine." (*Ibid.*, criticizing *Balon v. Drost* (1993) 20 Cal.App.4th 483, 486 [divided

---

[5] Compare *Acosta v. Glenfed Development Corp.* (2005) 128 Cal.App.4th 1278, 1293 [as for the statutory exception to the section 337.15 time bar—the exception for a contractor's willful misconduct—"plaintiffs, not defendants, had the burden of production, specifically, the burden of producing sufficient evidence to raise a triable issue of material fact"], with *Varshock v. California Dept. of Forestry and Fire Protection* (2011) 194 Cal.App.4th 635, 651 ["Where, as here, an affirmative defense contains an exception, a defendant must also negate the exception as part of its initial burden on summary judgment if, but only if, the complaint alleges facts triggering potential applicability of the exception."].

10

panel concludes the plaintiff, who forgot the name of a defendant and did not review a police report with the name in it, could avail herself of section 474].)

The architects offered several significant pieces of evidence of plaintiffs' knowledge: (1) the August 2011 letter from the developer's lawyer to the architects, notifying them, under former Civil Code section 1375, of potential responsibility and also enclosing the Aquatech reports; (2) the September 2011 demand letter from the residential HOA's lawyer to the architects;[6] and (3) correspondence from both the commercial and residential owners demanding the architect's presence at mediation proceedings.

These documents, which were in the hands of plaintiffs' lawyers, including the lawyer who filed this lawsuit, were sufficient to make out a prima facie case of knowledge foreclosing use of the relation back doctrine. In particular, in the hands of plaintiffs' litigation counsel, the Aquatech reports were "readily available information," and they suggested a possible design problem. (*Woo*, *supra*, 75 Cal.App.4th at p. 180.) The mediation demands, which threatened litigation and whose intent was to pull the architects into a proceeding at which they would likely be asked to compensate plaintiffs for design defects, also signaled a belief that the architects likely bore some liability. And while the residential HOA's settlement demand letter pertained to the landing leak,

---

[6] Contrary to plaintiffs' assertion, the "mediation privilege" codified in Evidence Code section 1119 does not bar use of the settlement demand letter. First, it appears plaintiffs never raised the privilege below, and so cannot assert it on appeal. (Code Civ. Proc., § 437c, subd. (b)(5) ["Evidentiary objections not made at the hearing shall be deemed waived."]; see *Foxgate Homeowners' Assn. v. Bramalea California, Inc.* (2001) 26 Cal.4th 1, 10, fn. 7 ["Failure to object to admission of evidence of events occurring during a prior mediation has been held to constitute a waiver."].) Having not raised and litigated the objection below, there is also insufficient evidence linking the demand letter to, for instance, the conduct of ongoing mediation. Second, even if parties engage in mediation, not every communication between them is shielded by the privilege. The privilege does not protect "communications, negotiations, and settlements made in the regular course of the litigation." (*Wimsatt v. Superior Court* (2007) 152 Cal.App.4th 137, 161.)

11

not the podium leak, it also is some evidence plaintiffs believed the architect should face liability, at least on some theory. (See *Optical Surplus, Inc. v. Superior Court* (1991) 228 Cal.App.3d 776, 784 [demand letter gives rise to knowledge of identity and liability, even when the recipient's response convinces the plaintiff otherwise].)

***Insufficiency of Showing to Raise Triable Issue***

With the burden shifted, it was incumbent on plaintiffs to present evidence that (a) they were reasonably ignorant of the theories of liability suggested by the evidence defendants presented, or (b) if their theory of liability was different, what that theory was and why they first discovered it only after the 10-year statute had run.

In an attempt to satisfy this burden, plaintiffs offered declarations from their various attorneys. As we have recited above, their showing boiled down to the following:

Humbert averred that, in September 2011, he "communicated with Charles Saul of Aquatech—who had been investigating the Podium and preparing the reports noted above—regarding [the architects'] potential liability. Although Mr. [Saul] is not an architect," Humbert stated "Aquatech specializes in water infiltration investigations" and "[a]s a result of this communication, I did not believe I had a basis to pursue a claim against" the architects.

Williams, in turn, averred he did not, before filing the initial complaint, either "consult with an architect or design professional regarding the liability of Kotas or any of the other design professionals on the project," or "review any of the project documents, the plans or specifications, or any of the contracts with the designers and contractors on the project, including Kotas' contract," or "receive any information from Aquatech, MCA or any other source indicating that Kotas was liable for the deficiencies in the Podium, the Landings, or any other defects or damages at the property." Rather, "[i]n the course of preparing for his deposition, Omar Hindiyeh of CMA Consulting, one of plaintiffs' experts, became aware of Kotas' liability and so informed me."

As for the forwarded Calderon Notice, plaintiffs claimed it did not mean anything and they were simply statutorily required to send it on. As for the request that the architects participate in the mediation and the settlement demand directed to the architects, plaintiffs claimed neither indicated any basis for believing the architects might be liable either—the settlement demand was sent merely because the architects were "involved" in the pretrial mediation.

We are troubled, to say the least, by plaintiffs' cavalier dismissal of any significance of the Calderon Notice, their request that the architects participate in the mediation, and their settlement demand directed to the architects. These efforts were designed to involve defendants in anticipated litigation and to extract money from them for plaintiffs' claimed losses. It is difficult to reconcile this with plaintiffs' current assertion that they had no basis whatsoever to believe the architects bore any responsibility for their damages. Thus, we are hard pressed to conclude plaintiffs could ask defendants to mediate and demand payment from them, but could not also timely name them as defendants in their complaint.

The declarations are best characterized as conclusory and oblique. They do not explain why the Aquatech reports were not "readily available information" supplying at least some basis for potential liability by the architects. While Humbert states he "communicated" with Saul and as "a result" did "not believe" there was a basis to pursue the architects, this is utterly conclusory. Wilson's declaration is equally so. The sum total of the explanation of the belated discovery is a single sentence: "In the course of preparing for his deposition, Omar Hindiyeh of CMA Consulting, one of plaintiffs' experts, became aware of Kotas' liability and so informed me." This does not explain what in front of the expert was new or provide a clue as to plaintiffs' newly discovered theory of liability. In essence, plaintiffs are claiming they were ignorant, but have refused to say of what they were ignorant, how their supposedly newfound knowledge came to light, and why this knowledge supports liability.

13

Plaintiffs seem to believe the architects, themselves, had to make a "foundational showing as to what [they] did wrong." Only then, according to plaintiffs, would they have to put on evidence of their ignorance. This puts the cart before the horse. It would allow plaintiffs to bring in new defendants without giving any reasons at all, and would ask newly named defendants to guess why they were being belatedly hailed into court. Only plaintiffs know the reason they came to believe they had a basis to sue the architects, and they needed to disclose it. The bald assertion that "now we know, but before we did not" is too conclusory to stave off summary judgment. (*Scherer v. Mark* (1976) 64 Cal.App.3d 834, 841, 843 (*Scherer*).)

In *Scherer*, the plaintiff substituted a new defendant, Dr. Mark, for a Doe defendant after supposedly gleaning information from the deposition of two nurses. (*Scherer, supra*, 64 Cal.App.3d at p. 843.) The substitution, however, came after the applicable statute of limitations had expired. (*Id.* at p. 839.) With a level of specificity (or lack thereof) similar to that which plaintiffs provided here, the plaintiff in *Scherer* justified the late substitution by asserting only that " 'the exact basis of [Dr. Mark's] negligence did not become exactly apparent until the two depositions were taken.' " (*Id.* at p. 843.) Affirming summary judgment to Dr. Mark on statute of limitations grounds, the appellate court concluded plaintiff's "statement is not an assertion of the existence of a fact giving rise to a cause of action. That statement does not say what if any new fact was discovered through the deposition. It does not say that the defendant Mark concealed any such fact. That statement shows only that after the taking of the deposition plaintiff changed her mind and decided to sue Dr. Mark." (*Id.* at pp. 841, 843.) Accordingly, the appellate court concluded the plaintiffs' untimely claim against Dr. Mark could not relate back to defeat the statute of limitations. (*Id.* at pp. 841, 843.)

As in *Scherer*, plaintiffs here have not given the architects or the court any substantive explanation of why they are entitled to use Doe pleading to avoid the 10-year statute of repose. Thus, in the face of the architects' prima facie showing, including the

14

contents of the Aquatech report, they presented no evidence raising a triable issue of fact on the question of their ignorance.  (See also *Woo*, *supra*, 75 Cal.App.4th at pp. 177–178 [no genuine explanation for why plaintiff knew, forgot, and then remembered identity of Doe]; *Dover v. Sadowinski* (1983) 147 Cal.App.3d 113, 117–118 [plaintiff's ignorance cannot be shown by asserting no knowledge of " 'how *deeply* as a negligent individual, [defendant] was involved' "].)

This case is unlike *Mishalow v. Horwald* (1964) 231 Cal.App.2d 517 (*Mishalow*), despite plaintiffs' assertion it "involved circumstances almost identical to those here."  In *Mishalow*, the parents sued several doctors and Doe defendants for negligently treating their son, resulting in his death.  (*Id.* at p. 518.)  Later in the case, the parents substituted a another doctor, Dr. Horwald, for one of the Does.  Dr. Horwald asserted the statute of limitations on summary judgment, claiming the parents had known of his role as the anesthesiologist to their son since long before the running of the statute.  (*Ibid.*)  The parents, in response, asserted they only recently became aware of the basis of Dr. Horwald's liability.  The parents' attorney submitted a declaration explaining at the time of first filing, the parents only had reason to believe their son's death occurred because of an unreasonable delay in starting surgery to remove the child's spleen; they did not have knowledge of anything that occurred during the surgery related to anesthesia.  Only during consultation with an expert with specialized knowledge in the use of anesthesia did the parents' lawyer learn their son's death was likely due to the anesthesiologist's negligence.  (*Id.* at pp. 518–521.)  The appellate court reversed the summary judgment to Dr. Horwald, concluding, under section 474, there had been no readily accessible way of sooner discovering Dr. Horwald's role.  (*Id.* at p. 525.)  *Mishalow* did not involve any prefiling claims of liability, requests to mediate or settlement demand.  Nor did it involve a situation where a significant report had been prepared which at least suggested the possibility of negligently drawn plans.

15

Plaintiffs contend section 411.35 also requires reversal of the summary judgment. This section provides that before suing an architect, a plaintiff's attorney must first file a certificate stating he or she: (1) has consulted with another architect who believes the defendant architect was negligent; (2) did not have time to consult another architect because of an impending statute of limitations, but will do so promptly; or (3) attempted to consult with three architects, but none would agree to the consultation. (§ 411.35, subds. (a)–(b).) According to plaintiffs, the fact that they did not to file a certificate until they substituted the architects into the case means they must have lacked the requisite knowledge sufficient to sue them until that time.

But the mere timing of the certificate, something entirely within plaintiffs' control, does not answer the question of what plaintiffs knew and when. Moreover, the process under section 411.35 explicitly allows plaintiffs to file a placeholder certificate so as to not run afoul of the statute of limitations. (See § 411.35, subd. (b)(2).)

## DISPOSITION

The judgment is affirmed. Respondents to recover costs on appeal.

_____
Banke, J.

We concur:


_____
Humes, P. J.


_____
Margulies, J.

17